IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CALLISTER NEBEKER & McCULLOUGH, Plaintiff/Counterdefendant, vs. UNITED STATES OF AMERICA, Defendant/Counterclaimant. | ORDER AND MEMORANDUM DECISION Case No. 2:14-cv-919-TC |

Plaintiff/Counterdefendant Callister Nebeker & McCullough (CNM) filed this action against Defendant/Counterclaimant United States of America challenging penalties totaling more than $11 million that the Internal Revenue Service (IRS) assessed against CNM in 2010. The IRS filed a counterclaim asking the court to enter judgment against CNM for the unpaid penalties.

CNM has filed a Motion for Judgment on the Pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. CNM contends that the court can grant judgment on all issues in favor of CNM based on collateral estoppel, the Eighth Amendment's Excessive Fines Clause, and the undisputed allegations in its Complaint and the IRS's Counterclaim.

For the reasons set forth below, the court finds that the allegations in the IRS's Counterclaim are sufficient to state a claim as a matter of law,[1] that collateral estoppel does not

---

[1] The parties present material that is outside the pleadings, but because the court will not convert the motion to one for summary judgment, the court does not consider that evidence.

bar the penalty action, and that the court, given the record before it, cannot decide the Eighth Amendment issue at this stage in the litigation. Accordingly, CNM's motion is DENIED.

## INTRODUCTION

According to the IRS, "[t]his case arises out of [Callister Nebeker & McCullough's] noncompliance with federal tax reporting and disclosure statutes." (United States' Mem. Opp'n 9, ECF No. 24.) Although the parties' pleadings discuss the case facts and tax law requirements in detail, much of that information is not necessary to the court's decision on CNM'S motion. This order provides a simplified version of the events and arguments to provide context, but, in short, CNM is not entitled to judgment on the pleadings.

In 2010, the IRS assessed two penalties against CNM: $195,081 for violating 26 U.S.C. § 6707 ("Failure to furnish information regarding reportable transactions") (the Section 6707 Penalty); and $11,280,000 for violating 26 U.S.C. § 6708 ("Failure to maintain lists of advisees with respect to reportable transactions") (the Section 6708 Penalty).

CNM requests the following relief: (1) a refund and abatement of the Section 6707 Penalty and the Section 6708 Penalty; (2) a finding under the Administrative Procedures Act (APA) that the IRS's assessment of the $11.28 million penalty was an abuse of discretion; (3) a finding that CNM is entitled to attorneys' fees under 26 U.S.C. § 7430; (4) a finding that the $11.28 million penalty is an unconstitutionally excessive fine under the Eighth Amendment; and (5) a finding that the penalty action is barred by collateral estoppel because of the IRS Tax Court opinion titled Love v. Commissioner of Internal Revenue, 103 T.C.M. (CCH) 1887 (2012).

---

Even so, if the court were to consider the outside material, there is no question that the issues are too fact-based to decide the case at this stage in the litigation.

The IRS, in its Counterclaim, asks the court to order CNM to pay the penalties.[2]

**BACKGROUND**[3]

CNM is a law firm whose practice includes providing advice to clients about employee benefit plans and tax matters. The tax issues in this case arise out of transactions relating to the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C.A. §§ 1001-1191c.

Under ERISA, employers are encouraged to adopt retirement plans that cover a broad range of employees instead of a disproportionate group of highly-compensated employees. Such plans are called "nonqualified deferred compensation plans" (NQDCP).

Certain tax allowances and consequences apply to such plans. For instance, ERISA allows employers to deduct certain employer contributions as business expenses. But Congress subjects contributions to NQDCPs to a matching principle: the timing of the employer's deduction for compensation must match the employee's reporting of that compensation as income. The employer must wait to reduce its taxable income until the employee reports the compensation income some time in the future.

According to the IRS, "[i]n 2001, certain attorneys with CNM began to promote a tax avoidance scheme designed to shelter business income of certain clients from taxation through acceleration of deductions for employer contributions to NQDCPs." (Counterclaim ¶ 8, ECF No. 13.) CNM's 2001 "scheme" led to what the IRS refers to as the 2004 "unwinding scheme" (the

---

[2]Under protest and as a prerequisite to suit, CNM paid the $195,081 penalty and $10,000 toward the $11.28 million penalty. The IRS seeks the remaining $11.075 million.

[3]When evaluating a Rule 12(c) motion, the court must take the non-moving party's allegations (in this case, the allegations in the IRS's Counterclaim) as true. The court must also view the factual allegations in the light most favorable to the IRS. Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009).

subject of the penalties at issue in this case).

CNM implemented its "unwinding scheme" for clients (individual business owners) in 2004 after the IRS issued a new regulation targeting abuses arising out of transactions similar to the 2001 scheme. In other words, CNM's clients needed to change or abandon (unwind) the NQDCP set-up they had been using since 2001. But part of that unwinding process caught the IRS's attention and, consequently, the IRS came knocking on CNM's door. IRS demanded that CNM disclose certain information, CNM resisted, the IRS fined CNM, and the dispute giving rise to this lawsuit came to life.

**Course of Events Leading to the Penalty Assessment**

Beginning in 2001, CNM set up a complicated tax planning transaction for clients that the IRS now characterizes as a tax shelter. That tax shelter (the "2001 scheme") is not the subject of this lawsuit, but some understanding of the transaction is necessary to understand the subsequent transaction (the "2004 unwinding scheme") that led to the issues now before the court. The court refers to the 2001 scheme as the "ESOP Model." The ESOP (the acronym for "employee stock ownership plan") was a crucial portion of the original transaction set up by CNM.

**The ESOP Model (the Original Tax Shelter)**

The transaction went something like this:

The client, through its business (the "Operating Company"), and with the advice and assistance of CNM, established a "Management Company." The Management Company was set up as an "S" corporation, a corporate form that allows income of the Management Company to pass through to the shareholders of the Management Company. In this case, the client would establish an ESOP as the sole shareholder of the Management Company.

4

Then the Operating Company transferred its employees (on paper) to the Management Company and leased the employees' services from the Management Company. The lease payments were set at an amount equal to the deferred compensation owed by the Operating Company to "key managers/owners of the operating company" under the Operating Company's NQDCP. (Counterclaim ¶ 9.)

The lease payments passed through the Management Company and went directly to the ESOP, so the lease payments were not considered taxable income to the Management Company. The income was attributed to the shareholder ESOP, but the ESOP had no tax liability on the contributions because it was exempt from taxes.

According to the IRS, the ESOP improperly reduced stock value held by rank and file employees and sheltered income from taxation. (See id. ¶ 20 ("'Rather than being a mechanism for the transfer of not only ownership, but also the rights associated with ownership, to the employees of the S corporation, the ESOP is used as part of a structure designed to shelter profits that will be paid as future compensation for a small group of executives or management employees.'") (quoting Prohibited Allocations of Securities in an S Corporation, 68 Fed. Reg. 42,970, 42,972 (July 21, 2003)). The IRS alleges that CNM promoted the ESOP Model to its clients as a way to improperly accelerate corporate deductions and shelter profits of the Operating Company from taxes. (See id. ¶ 13.)

Apparently many other entities in the country were using the same type of model. The IRS determined that those types of transactions were being used by taxpayers (including clients of CNM) in a way that was contrary to the intent of Congress. Accordingly, it changed the rules.

**IRS Issues New Regulation**

On July 21, 2003, the IRS issued a Temporary Regulation that targeted the ESOP Model. Under the new regulation, taxpayers using the ESOP Model were given a one-year grace period to make necessary changes. That is, no later than July 21, 2004, the taxpayers were required to "unwind" their ESOP Model transactions to comply with the new rule.

**CNM's Options to Clients for Unwinding ESOP Model Transactions**

On January 15, 2004, in response to the IRS's new regulation, CNM sent a letter to its clients providing three options for "unwinding" the ESOP Model. The first and third options did not concern the IRS. But the IRS questioned the validity of the second option ("Option 2" or "unwinding scheme"), which CNM described to its clients as follows:

> Before July 21, 2004, cause the ESOP to sell the management company stock it held to the individual client(s) for fair market value, then have the management company pay out the deferred compensation, and terminate the ESOP.

(Complaint ¶ 11, ECF No. 2.)

The IRS alleges that CNM's Option 2 created a potentially abusive tax shelter that triggered reporting and disclosure requirements in Internal Revenue Code (IRC)[4] Sections 6111, and 6112.[5] CNM's failure to report and disclose prompted the IRS to assess penalties against CNM under Sections 6707 and 6708.

Under Section 6111, a "tax shelter organizer" must register the "tax shelter" with the IRS. Failure to do so results in penalties under Section 6707. In addition, Section 6112 requires a "tax shelter organizer" to maintain a list of participants in any "potentially abusive tax shelter" and to provide that list to the IRS upon request. Failure to do so results in penalties under

---

[4] The IRC is set forth in Title 26 of the United States Code.

[5] Unless otherwise noted, all section citations are to the IRC.

Section 6708, unless the "tax shelter organizer" establishes "reasonable cause" for failure to do so.

The terms "tax shelter," "tax shelter organizer," and "potentially abusive tax shelter" are defined in the IRC. "Reasonable cause" is not. The parties dispute whether CNM's unwinding scheme as well as CNM's refusal to provide a list of its clients who unwound the original transaction, fall within those definitions. The parties also dispute whether CNM's reason for failure to disclose falls within the reasonable cause exception.

**IRS's Demand for CNM's Client List**

According to the IRS, the unwinding scheme[6] triggered obligations under Sections 6111 and 6112. On May 31, 2006, the IRS requested the list that it alleged CNM was obligated to keep under Section 6112. CNM did not provide the list, contending that it was not obligated to do so because it was neither a "material advisor" nor a "tax shelter organizer," and because the unwinding scheme was not a "potentially abusive tax shelter." Alternatively, CNM argued that even if the transaction implementing the unwinding scheme fell within the statutory definition of a "potentially abusive tax shelter," CNM was not required to produce the list because doing so would violate attorney-client privilege under the Utah Rules of Professional Conduct. CNM says it refused to provide the list based on advice of counsel, and cited to the "reasonable cause exception" in Section 6708, which, if satisfied, would allow CNM to escape the disclosure requirements and penalties.

---

[6]For a summary of the unwinding scheme, as the IRS characterizes it, see IRS's opposition brief (ECF No. 24) at pages 16-17, which describes five steps of the scheme, and its Exhibit 7, which contains the seventeen-step checklist created by CNM for clients who implemented Option 2.

**IRS's First Summons**

When CNM refused to comply with the IRS's demand for information, the IRS issued a summons ("First Summons") to CNM on August 24, 2006. CNM responded on September 12, 2006, again refusing to produce an investor list on the basis that CNM and the transaction did not fall within the requirements of Section 6112.

**IRS's Second Summons**

On October 6, 2006, the IRS issued a second summons ("Second Summons") to CNM in response to requests from CNM for "specific guidance" as to what transactions required disclosure and for specific information about companies the IRS believed were involved in the unwinding scheme. In the Second Summons, the IRS also ordered CNM to disclose investor lists under Section 6112.

In a December 19, 2006 letter to the IRS from CNM's counsel, CNM declined to produce the requested files and said that "these issues must ultimately be decided by a court of law if you decide to seek enforcement of the summons." (Complaint ¶ 23 (quoting letter).) In January 2007, an IRS attorney told CNM that legal proceedings might be brought against CNM.

**IRS Enforcement Action**

Almost one year later, on December 11, 2008, the IRS filed a petition to enforce the Second Summons. After several months, the parties filed a joint stipulation to dismiss the action. In the motion to dismiss, the IRS agreed that the Second Summons would be "deemed withdrawn." (Id. ¶ 25.) The settlement agreement provided that CNM would produce certain documents but "[i]n no event will CNM be obligated . . . to disclose client identities" in the context of the proposed settlement. (Id.; Answer ¶ 25, ECF No. 13.) The action was settled on

November 30, 2009.

CNM points to the withdrawal of the Second Summons and the settlement as evidence that the IRS may not pursue the penalty action. But the IRS states in its Answer to CNM's Complaint that the United States "fully reserved its right to assess penalties against the plaintiff for its long-term noncompliance with disclosure requirements." (Answer ¶ 25.)

### Assessment of Penalties

On January 22, 2010, the IRS assessed penalties against CNM, including the Section 6707 penalty of $195,081, and the Section 6708 penalty of $11.28 million. By that time, approximately 1,128 days had passed from the date of the Second Summons. The IRS assessed a $10,000 fine for each day, which resulted in the $11.28 million penalty. See 26 U.S.C. § 6708(a)(1) (authorizing IRS to assess $10,000 fine for each day the party does not comply with the disclosure request).

### Administrative Challenge

CNM challenged the penalties in the Appeals Office of the IRS. The Appeals Office sustained the Section 6707 and Section 6708 penalties, at which time CNM submitted a Form 843 claiming a refund and requesting abatement of the penalties. When the IRS did not act on CNM's refund and abatement petition, CNM filed its complaint with this court.

## ANALYSIS[7]

### Standard of Review

CNM has filed a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).[8]  The standard for deciding a 12(c) motion is the same standard applied when deciding whether to grant a motion to dismiss for failure to state a claim upon which relief may be granted under Rule 12(b)(6).  Aspenwood Inv. Co. v. Martinez, 355 F.3d 1256, 1259 (10th Cir. 2004).  The court must accept the nonmoving party's allegations as true and view factual allegations in the light most favorable to the nonmoving party.  See Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009).  Detailed allegations are not required; it is enough to "'state a claim for relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

---

[7]This court has jurisdiction over CNM's action.  Before filing its Complaint here, CNM filed a claim with the IRS for refund and abatement of both penalties (see 843 Claim Form, attached to Complaint).  Since then, a period of more than six months has passed, during which the IRS did not respond to that claim.

> [A] party's administrative remedies within the Internal Revenue Service shall be deemed to have been exhausted for purposes of [this section if, during] the six-month period following the day on which the party's claim for refund is filed, the party's claim for refund is not denied, and the Internal Revenue Service has failed to process the claim with due diligence.

26 C.F.R. § 301.7430-1(f)(4)(ii).

[8]CNM titles its motion as a one for judgment on the pleadings, although aspects of its motion and related pleadings resemble briefing on a motion for summary judgment, including presentation of documents outside the pleadings (for example, declarations and CNM's 843 Form submitted to the IRS).  The court declines to convert CNM's filing to a motion for summary judgment so it does not consider material outside the pleadings.

**CNM's Motion for Judgment on the Pleadings**

CNM asserts that the IRS's admissions to allegations in the Complaint and the IRS's Counterclaim allegations establish ample, undisputed facts to decide the issues as a matter of law. In response, the IRS contends that: (1) the IRS has alleged a prima facie case in its Counterclaim, which is all that Rule 12(c) requires; (2) collateral estoppel does not apply here; and (3) CNM's 12(c) motion is a motion for summary judgment in disguise which may not be granted because all of CNM's claims and defenses present factual disputes that foreclose the court's ability to decide the matter at this stage.

The court holds that CNM's collateral estoppel argument is not valid, that the IRS has satisfied its burden under Rule 12(c), and that the claims and defenses require decisions on factual disputes that cannot be resolved by reference to the allegations set forth in the Complaint and Counterclaim.

    **1.    Sufficiency of Allegations**

        a.    Registration and Disclosure Obligations

Under the IRC, "[a]ny tax shelter organizer shall register the tax shelter" with the IRS. IRC § 6111(a)(1) (emphasis added). The IRS contends that the "unwinding scheme" is a tax shelter and that CNM is a tax shelter organizer.

A "tax shelter organizer" is defined as "the person principally responsible for organizing the tax shelter." Id. § 6111(e)(1). The statute defines "tax shelter" as any investment "with respect to which any person could reasonably infer from the representations made, or to be made, in connection with the offering for sale of interests in the investment that the tax shelter ratio for any investor . . . may be greater than 2 to 1" and is "substantial." Id. § 6111(c) (emphasis added).

The IRC defines "tax shelter ratio" as "the ratio which the aggregate amount of the deductions . . . bears to the investment base as of the close of the year."  Id. § 6111(c)(2) (emphases added).

The "reasonably infer" test and calculation of the "tax shelter ratio" are key to determining whether the transactions by CNM's clients should have been registered. Importantly, the IRS points out that the phrase "any person could reasonably infer" requires a determination of fact.  "It is wholly inappropriate to move for judgment on the pleadings at the outset of the case if the moving party relies on fact-based arguments such as 'the reasonableness of [the movant's] actions."  (Opp'n Mem. 30 (quoting Reid v. LVNV Funding, LLC, Case No. 2:14-cv-471-DAK, 2015 WL 926146, at *4 (D. Utah Mar. 4, 2015) (unpublished)).  The IRS's allegation (which the court must take as true) that CNM "could reasonably infer" that the 2004 unwinding scheme is a tax shelter and that CNM was a tax shelter organizer is sufficient to meet the Rule 12(c) standard.[9]  (See Counterclaim ¶¶ 8-18.)

Under the IRC, "any person who organizes any potentially abusive tax shelter . . . shall maintain . . . a list identifying each person who was sold an interest in such shelter . . . ."  IRC § 6112(a) (emphasis added).  A "potentially abusive tax shelter" is "any tax shelter (as defined in section 6111) . . . which . . . [has the] potential for tax avoidance or evasion."  Id. § 6112(c) (emphasis added).  The client list must be made available for inspection upon request by the IRS. Id. § 6112(c)(1)(A).  Because the section rests in part on the term "tax shelter," the factual

---

[9]Other factual issues include whether CNM was a tax shelter organizer, which turns in part on representations made by CNM to its clients.  As the IRS argues, "it is impossible to ascertain at this stage of the case exactly when CNM was providing legal advice as opposed to business services or advice."  (Opp'n Mem. 52.)  "Ultimately, the representations made by CNM in 2003 and 2004 to the twenty-five investors will be a matter for discovery in this case." (Id. at 12 n.6.)

determination of "reasonably infer" applies here as well.  The IRS's allegations about that satisfy the pleading requirements.

        b.    <u>Penalties</u>

Penalties for failure to register a tax shelter and failure to disclose the list of participants are imposed under Sections 6707 and 6708.  Both of those sections provide an exception for someone who has "reasonable cause" for failing (or refusing) to hand over the list.  CNM asserts attorney-client privilege and advice-of-counsel are reasonable cause for its nondisclosure.

As the IRS points out, the "reasonable cause" factor requires a fact intensive determination that may not be hashed out in CNM's motion for judgment on the pleadings.  For instance, whether the attorney-client privilege applies requires a factual determination of whether each client had a reasonable expectation of privilege or confidentiality in the information being requested.  According to the IRS, the Utah Professional Rules of Conduct

> permit[] disclosures when a lawyer reasonably believes disclosure is necessary to comply with law or a court order or when a client provides informed consent. . . . There is no means of finding out, at this preliminary stage, what circumstantial or direct evidence may exist that bears on the reasonable belief of CNM's attorneys or that bears on any efforts by CNM to obtain client consents to disclose.  This is a matter for discovery.

(Opp'n Mem. 49.)

And the advice-of-counsel reason requires determining the scope of representation by that counsel and the scope of advice given by that counsel.  "The reliance-on-advice-of-counsel defense cannot be fairly litigated until the [IRS] obtains discovery regarding the actual advice provided, and not merely the positions that its counsel opted to articulate in correspondence to the IRS.  The [IRS] has no information regarding the scope of the advice and the scope of the

engagement." (Opp'n Mem. 13 n.7.) The court cannot rely on the pleadings to make such a fact-based determination.

### e. Excessive Fine Under the Eighth Amendment

CNM asserts that the $10,000 per day penalty imposed by the IRS under Section 6708 is unconstitutional under the Eighth Amendment. The Eighth Amendment prohibits imposing excessive fines as punishment.

First, the court must determine whether the civil tax penalty was punitive. Austin v. United States, 509 U.S. 602, 610 (1993). That determination requires an assessment of the penalty imposed and the purpose for the penalty. Second, the court must consider whether the penalty was excessive. United States v. Bajakajian, 524 U.S. 321, 334 (1998).

The court cannot decide at this time whether the $11.28 million fine is excessive. The court must determine whether the fine is proportionate to the gravity of the offense. Id. at 336-37. To do that, the court needs a fully developed record.

For purposes of CNM's motion, the court must take the allegations in the IRS's Counterclaim as true. And those allegations state that CNM engaged in conduct that the statutory fine was meant to prohibit—concealment and foot-dragging. Congress aimed to impose "more meaningful penalties" to avoid the ongoing "use of abusive tax avoidance transactions." H.R. Rep. No. 105-648 (I), 108th Cong., 2d Sess. 2004, Pub. L. 108-357 (American Jobs Creation Act of 2004).[10] According to the IRS,

> CNM was fully aware of its obligation to maintain an investor list for the unwinding scheme (Counterclaim ¶ 37), and it obdurately and intentionally

---

[10] 2004 WL 1380512.

14

> refused to provide the list to the IRS, notwithstanding repeated requests, meetings and exchanges of letters. (Counterclaim ¶¶ 38-46.) As a consequence, the identities of two of the investors in the unwinding scheme were never revealed to the IRS. Moreover, drawing all inferences in favor of the United States, CNM intentionally hid the proverbial ball over the course of 2006, only meeting with the IRS after receipt of the October 2006 summons in which the IRS listed particular companies in connection with the request. (Counterclaim ¶¶ 41-42.)

(Opp'n Mem. 57.) There is simply not enough information in the record (and no option at this point to weigh the competing allegations) to allow the court to make a decision on the Eighth Amendment question.

### 3.     APA

For the same reasons that the court cannot determine whether the allegations state a claim for violation of Sections 6111 and 6112, the court cannot determine whether the IRS's actions were an abuse of discretion under the Administrative Procedures Act.

### 4.     Collateral Estoppel

"Collateral estoppel bars a party from relitigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim." Moss v. Kopp, 559 F.3d 1155, 1161 (10th Cir. 2009). To succeed on the affirmative defense of collateral estoppel, CNM must establish, among other things, that the "issue previously decided is identical with the one presented in the action in question[.]" Id.

CNM contends that the decision in Love v. Commissioner of Revenue, 103 T.C.M. (CCH) 1887 (2012) (a United States Tax Court determination),[11] precludes the IRS from litigating the issue before the court. According to CNM, the court in Love decided "that the

---

[11] The court assumes, without deciding, that an agency administrative court decision may be used to collaterally bar an issue raised in federal district court.

unwinding transaction in Option 2 did not involve an abusive tax shelter or transaction." (Pl.'s Mot. J. Pleadings at 20, ECF 21.)

But the issue decided in <u>Love</u> is not identical to the issue before the court. In <u>Love</u>, the Tax Court addressed the IRS's disallowance of taxpayers' claimed flow-through deductions under IRC Section 269. As the IRS notes, the <u>Love</u> decision does not consider or address Sections 6111 or 6112 or address "the question as to what a reasonable person might infer from representations made by CNM as to the nature of the investor's investments." (Opp'n Mem. 12.) The issue before this court is not whether the unwinding transaction was "legitimate" or "abusive" or implemented "principally for tax avoidance purposes." Rather, the question here is whether, <u>on a prospective basis</u>, CNM's unwinding transaction could be construed by a reasonable person as a potentially abusive tax shelter with a tax shelter ratio greater than 2 to 1, that triggered registration and disclosure obligations.

In addition, the tax shelter test is an objective one. The decision in <u>Love</u> determined whether the taxpayers had a subjective intent to avoid paying income tax. Here, the court must apply an objective measure to determine whether, if the transaction meets the 2:1 ratio and substantial investment tests, the transaction is a tax shelter subject to disclosure; no tax avoidance motive is required.

Because the issues are not identical, CNM is not entitled to issue preclusion.

**ORDER**

For the foregoing reasons, Plaintiff/Counterclaimant CNM's Motion for Judgment on the Pleadings (ECF No. 21) is DENIED.

DATED this 9th day of October, 2015.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge